Presented to the Court by the foreman of the
Grand Jury in open Court, in the presence of
the Grand Jury and FILED in the U.S.
DISTRICT COURT at Seattle, Washington.

_____July 24_____ 20_19_
WILLIAM M. McCOOL, Clerk
By_____ Deputy

# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAJNINDER JUTLA,<br><br>Defendant. | NO. **CR19-141** RSM<br><br>INDICTMENT |

The Grand Jury charges that:

## I.   BACKGROUND

At all times material and relevant to this Indictment:

1.      RAJNINDER JUTLA was a physician licensed to practice medicine in the states of Washington and Oregon. RAJNINDER JUTLA was a medical board certified anesthesiologist and pain management specialist.

2.      RAJNINDER JUTLA was the owner and manager of Mind Your Body Clinic PLLC ("Mind Your Body Clinic"), which had locations in Washington, including its primary location in Seattle, as well as a location in Lake Oswego, Oregon.

### A.   Insys and Subsys

3.      Insys Therapeutics, Inc. ("Insys") was a company incorporated in Delaware and headquartered in Chandler, Arizona.

4.      John Kapoor was the founder and owner of Insys.

INDICTMENT - 1
RAJNINDER JUTLA

1    5.    Michael Babich held executive management positions at Insys, including

2  President and Chief Executive Officer.

3    6.    Alec Burlakoff held various executive management positions in Insys,

4  including Vice President of Sales.

5    7.    Richard Simon held various executive management positions in Insys,

6  including Regional Sales Manager for the Central Region and National Director of Sales.

7    8.    K.W. was employed by Insys as a Specialty Sales Professional ("SSP") and

8  was eventually promoted to the position of District Sales Manager (DSM).  K.W.'s roles

9  and responsibilities as an SSP included marketing Insys and the drug Subsys to

10  healthcare providers in Washington and Oregon.

11    9.    On or about January 4, 2012, the Food and Drug administration ("FDA")

12  approved Insys's application to market a drug called Subsys to patients suffering from

13  breakthrough cancer pain.  Breakthrough cancer pain is a sudden, short-term increase in

14  pain that may occur in patients who have chronic pain from cancer.

15    10.    Subsys was a potent opioid containing fentanyl that was designed to rapidly

16  enter a patient's bloodstream upon being sprayed under the tongue.  Fentanyl is a

17  synthetic opioid that is classified as a Schedule II controlled substance under the

18  Controlled Substances Act.  It is primarily used as a pain relief medication.  Fentanyl

19  produces effects similar to the opioids morphine and heroin, but fentanyl has a greater

20  potency and a shorter duration of action.  Fentanyl is rapidly distributed to the brain,

21  heart, lungs, kidneys and spleen.

22    11.    Drugs like Subsys which contain fentanyl are highly addictive and can lead

23  to physical and/or psychological dependence, abuse and addiction.

24    12.    Due to the potency of Subsys and the potential for addiction, the FDA

25  approved the use of the drug solely for "the management of breakthrough pain in cancer

26  patients 18 years of age and older who are already receiving and who are already tolerant

27  to opioid therapy for their underlying persistent cancer pain."

28

13.     As a fentanyl product, Subsys had a high risk of misuse, abuse, addiction and overdose.  To reduce these risks, on December 28, 2011, the FDA approved a single, shared system Risk Evaluation and Mitigation Strategy (REMS) for the entire class of transmucosal immediate-release fentanyl (TIRF) prescription medicines.  This "TIRF REMS" Access Program, consisted of a restricted distribution program.  Accordingly, in each instance in which a patient was prescribed Subsys, both the prescriber and the patient were required to complete and submit a Patient-Prescriber Agreement Form detailing the risks and obligations imposed on both parties when a fentanyl product was prescribed.

14.     Before prescribing a TIRF drug like Subsys to a patient, the prescriber was required to complete and sign a REMS form which explicitly stated, "I understand that TIRF medications are indicated only for the management of breakthrough pain in patients with cancer who are already receiving, and who are tolerant to, around-the-clock opioid therapy for their underlying persistent pain."

15.     Virtually all of Insys's profits came from the prescribing of Subsys by health care providers in the United States.  Subsys was profitable for the company.  In 2015, for example, Insys reported approximately $330 million in revenue from Subsys.

16.     Subsys was approved for use in dosages of 100, 200, 400, 600, 800, 1200 or 1600 micrograms.  Patients were supposed to take one dose of Subsys per episode of breakthrough cancer pain and were required to wait four hours to take another dose of the drug if experiencing breakthrough pain.  Further, patients were instructed to limit the amount of Subsys they took to four or fewer doses per day.

17.     Subsys was expensive.  Depending upon the dosage and number of units prescribed, a prescription for Subsys usually cost thousands of dollars per month.  Most patients relied upon commercial insurance and/or publicly-funded insurance, including Medicare and Medicaid, to subsidize the cost of Subsys.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**B.      The Medicare Program and Subsys**

18.     The Medicare Program was established in 1965 pursuant to amendments to the Social Security Act.  The Medicare Program was a health care benefit program that provided basic health insurance coverage to certain disabled persons as well as to individuals 65 years or older.  Eligible persons could elect to participate in the program by completing an application and either agreeing to pay a premium for Medicare benefits, or arranging for a third party to pay such premiums.  Persons enrolled in the Medicare programs are hereinafter referred to as "beneficiaries."  Medicare was a "federal health care program" under 42 U.S.C. § 1320a-7b(f).

19.     The Medicare Program also included a prescription drug program known as "Part D," which was funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury.  The Part D program was administered by various "Plan Sponsors," each of which dictated the specific drugs it would cover and how much it would pay for those medications.  The Centers for Medicare and Medicaid Services ("CMS"), through the federal treasury, reimbursed the Part D Plan Sponsors for the covered drugs.

20.     In Washington, there were numerous Plan Sponsors that covered state residents, including but not limited to Aetna, Cigna, Humana, United Health Care, and Regence Blue Shield.

21.     Many Plan Sponsors as well as private insurance companies contracted with Pharmacy Benefit Managers (PBMs), which handled the administration of the prescription drug benefit on behalf of the Medicare Part D Plan Sponsors and private insurance companies.

22.     Most of the above-listed Medicare Plan Sponsors and PBMs administering Part D plans for them would only approve payment for Subsys that was prescribed to a Medicare patient if certain criteria were met, including (i) that the patient had a diagnosis of cancer, (ii) that the use of Subsys was for breakthrough cancer pain, and, in most

INDICTMENT - 4
RAJNINDER JUTLA

1 | cases, (iii) that other strong-acting narcotic pain relievers had been tried and been
2 | ineffective, not tolerated or contraindicated.

3 |      23.     Medicare would not pay for medications if the prescriptions were written in
4 | exchange for a bribe or kickback.

5 | **C.**     **Private Insurance Companies and Subsys**

6 |      24.     BlueCross/BlueShield of Illinois, Cigna Health Care, United Health Care,
7 | Moda Health Insurance and Regence Blue Shield, among others, were each private
8 | insurers and "health care benefit programs" under 18 U.S.C. § 24(b) that provided health
9 | insurance benefits to their members in exchange for the payment of premiums.

10 |      25.     Many private insurers contracted with PBMs to administer prescription
11 | drug benefits for their members. Express Scripts and OptumRx were PBMs that
12 | contracted with Plan Sponsors to administer the prescription drug benefit for Medicare
13 | Plan Sponsors and private insurers. Each was a health care benefit program under 18
14 | U.S.C. § 24(b).

15 |      26.     The above-listed private insurance companies and PBMs only approved
16 | payment for Subsys that was prescribed to a plan member if certain criteria were met,
17 | including (i) that the patient had a diagnosis of cancer, (ii) that the use of Subsys was for
18 | breakthrough cancer pain, and, in most cases, (iii) that other strong-acting narcotic pain
19 | relievers had been tried and been ineffective, not tolerated or contraindicated.

20 | **D.**     **Prior Authorization Procedure**

21 |      27.     Because of the high cost of Subsys, almost all of the Medicare Plan
22 | Sponsors, private insurance companies, and PBMs required providers to obtain
23 | authorization prior to the filling of a Subsys prescription. Providers were typically
24 | required to prepare and complete written prior authorization requests in which
25 | information concerning the patient and his or her relevant diagnosis for which Subsys
26 |
27 |
28 |

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  was prescribed, including the ICD-9 code,[1] was provided.  On the prior authorization

2  request form, the provider also confirmed whether the patient was opioid tolerant and

3  whether other short-acting narcotics had been tried and proven ineffective.  Upon receipt

4  of a completed prior authorization form, the Plan Sponsor, PBM, or private insurance

5  company made a determination as to whether it would approve payment for the Subsys

6  prescription.

7  **E.     Insys Reimbursement Center**

8       28.     In or about January 2013, due to the difficulty doctors were having in

9  obtaining approval for Subsys from insurance companies, Insys established a group

10  known as the Insys Reimbursement Center ("IRC").  The IRC comprised a group of Insys

11  employees based in Arizona who specialized in obtaining approval from insurance

12  companies for payment for Subsys.

13       29.     Practitioners using the IRC were required to provide Insys with detailed

14  information for all patients prescribed Subsys.  This information was provided on an

15  "Insys Reimbursement Center Patient Authorization & Referral Form" ("Opt-in Form"),

16  which included confidential patient information such as the name, date of birth, insurer

17  information, the medical diagnosis or diagnoses for which Subsys was being prescribed,

18  and the corresponding ICD-9 code associated with the diagnosis, as well as additional

19  information in support of the prior authorization in a section titled "Rationale for Prior

20  Authorization."

21       30.     At Mind Your Body Clinic, Insys employees typically completed the

22  Opt-in Forms based on the patient's medical chart notes and/or information

23  communicated to them by RAJNINDER JUTLA.  RAJNINDER JUTLA then typically

24  signed the Opt-in Forms.  The completed Opt-in Forms were then faxed or emailed to the

25

26

27

28

---

[1] ICD-9 stands for the International Statistical Classification of Disease and Related Health Problems 9th Revision ("ICD-9").  There was a recognized ICD-9 code for each medical diagnosis.  Medical facilities, practitioners, insurers, PBMs, government entities and pharmacies employed ICD-9 codes to classify diseases and injuries.

INDICTMENT - 6
RAJNINDER JUTLA

1  IRC, which would then use the information provided and initiate the prior authorization

2  process with the Plan Sponsor, insurance company, or PBM.

3       31.     RAJNINDER JUTLA elected to use the services of the IRC beginning no

4  later than January 2014 for the vast majority of prior authorizations for her Subsys

5  prescriptions.

6       32.     Most of RAJNINDER JUTLA's Opt-in Forms contained the following

7  certification signed by RAJNINDER JUTLA: "I certify that the above therapy is

8  medically necessary and to the best of my knowledge all information represented herein

9  is accurate and complete."

10  **F.    Insys Speaker Program**

11       33.     In 2012, Insys established a program, called the Insys Speaker Program

12  ("ISP" or "Speaker Program"), in which doctors and other qualified health care providers

13  would be compensated for purportedly providing educational programs concerning

14  Subsys to other health care providers. The purported purpose of the Speaker Program

15  was to gather licensed health care professionals who had capacity to prescribe Subsys and

16  educate them about the drug.

17       34.     Many of the ISP "presentations" took place at high-end restaurants, at

18  which the presenter would purportedly speak about the benefits of Subsys. Insys paid for

19  the cost of the meal for all attendees, up to $125 per person. In addition, Insys paid the

20  speaker a flat fee, ranging from $800 to $3700 per program.

21       35.     At various dates between 2012-2016, Insys hired third party companies

22  Scimedica, Inc. ("Scimedica") and Plan 365, Inc. ("Plan 365"), to manage the ISP. In

23  exchange for a fee, these companies made arrangements with the various restaurants

24  where the purported presentations were held and made payments to the restaurants and

25  the speakers. The sales representative assigned to the region was required to attend each

26  speaking program and was required to submit a receipt, sign-in sheet and evaluation form

27  for each program. Scimedica, Plan 365 or Insys would then issue payment to the

28  purported speaker at the program.

INDICTMENT - 7
RAJNINDER JUTLA

## COUNT 1
### (Conspiracy to Pay and Receive Kickbacks)

36.     The Grand Jury realleges and incorporates by reference preceding paragraphs 1-35 as if fully set forth herein.

**A.     The Conspiracy**

37.     From in or about February 2012 through in or about October 2016, at Seattle, in the Western District of Washington, and elsewhere, defendant RAJNINDER JUTLA did knowingly and willfully conspire and agree with employees, representatives and agents of Insys, who are known and unknown to the Grand Jury and who acted on behalf of Insys, to commit an offense against the United States, namely to knowingly and willfully offer, pay, solicit, and receive any remuneration, directly and indirectly, overtly and covertly, in cash and in kind, in return for purchasing and ordering, and arranging for and recommending the purchasing and ordering of goods, services, and items, that is, Subsys prescriptions, for which payment was made in whole and in part by a Federal Health Care Program, namely, Medicare, contrary to 42 U.S.C. § 1320a-7b(b)(1)(B), (2)(B).

**B.     Object of the Conspiracy**

38.     The object of the conspiracy was the unlawful payment kickbacks to RAJNINDER JUTLA and receipt of kickbacks by RAJNINDER JUTLA to induce, and in return for, her prescribing Subsys to her patients, including those who were Medicare beneficiaries.

**C.     Manner and Means of the Conspiracy**

39.     Due to the limited number of patients in the United States suffering from breakthrough cancer pain, Insys, by and through its officers, managers and employees, designed and implemented a strategy aimed at inducing health care providers to prescribe Subsys for pain that was caused by conditions other than cancer.  A primary target group for Insys officials was pain specialists who, like RAJNINDER JUTLA, were treating a

INDICTMENT - 8
RAJNINDER JUTLA

1 large volume of patients who were experiencing pain from a variety of medical
2 conditions.

3     40.    In order to induce pain specialists and other providers to prescribe Subsys
4 to patients who were not suffering from breakthrough cancer pain, Insys created the ISP
5 in 2012. Insys officials publically claimed that the purpose of the ISP was to educate
6 other providers concerning the benefits of Subsys. In reality, the primary purposes of the
7 Speaker Program were to provide a financial reward to providers who were prescribing
8 Subsys and to incentivize those providers to continue to prescribe Subsys in the future.

9     41.    Senior officials and managers of Insys regularly informed company sales
10 representatives that they should expect a "return on the investment" given to doctors who
11 were part of the Speaker Program and that they should inform these doctors that they
12 would not obtain any future Speaker Programs if they did not continue to prescribe
13 Subsys.

14     42.    On February 16, 2012, RAJNINDER JUTLA entered a consulting
15 agreement with Insys, which required RAJNINDER JUTLA to attend a Consultant
16 Meeting on or about March 23-24, 2012, in Scottsdale, Arizona. RAJNINDER JUTLA
17 was reimbursed $1,500 for attending the Consultant Meeting, in addition to travel and
18 lodging costs.

19     43.    In or around July 2012, RAJNINDER JUTLA was approved by Insys to
20 become an ISP speaker.

21     44.    In or around July 2012, October 2013, and March 2014, RAJNINDER
22 JUTLA entered into written agreements with Insys wherein she agreed to be paid to
23 provide Speaker Programs. In the contracts, RAJNINDER JUTLA falsely represented
24 that the Speaker Programs would be "of a professional quality conforming to generally
25 accepted industry standards and practices." RAJNINDER JUTLA further falsely
26 represented that the Speaker Program honoraria she received from Insys would be
27 consistent with "fair market value" and would not affect her decisions about prescribing
28 Subsys.

INDICTMENT - 9
RAJNINDER JUTLA

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

45.     RAJNINDER JUTLA began prescribing Subsys to her patients in or around March 2012, and began receiving payments from Insys for Speaker Programs in November 2012.

46.     Insys representatives, including Alec Burlakoff, Richard Simon, and K.W., assigned speaker programs based on a speaker's volume of Subsys scripts written.

47.     At a date on or after November 2012, Richard Simon told RAJNINDER JUTLA that the number of ISP events allocated to her would be based on the number of Subsys prescriptions RAJNINDER JUTLA wrote.  RAJNINDER JUTLA understood that the number of Speaker Programs allocated to her would be based on the number of Subsys prescriptions she wrote.

48.     In order to increase her remuneration from Insys, RAJNINDER JUTLA actively sought out more and more Speaker Programs from Insys.

49.     From November 2012 through June 2016, RAJNINDER JUTLA gave approximately 54 purported ISP presentations at various restaurants and other locations. For each of these purported presentations, RAJNINDER JUTLA was paid a fee of between $800 and $3,700.  In total, RAJNINDER JUTLA received more than $109,000 from Insys in compensation for purportedly speaking about Subsys.

50.     In exchange for speaker fees and free meals, RAJNINDER JUTLA wrote more prescriptions for Subsys, including prescriptions that were paid for by Medicare. Between 2012 and 2015, RAJNINDER JUTLA was one of the top prescribers of Subsys in the State of Washington.  During the years RAJNINDER JUTLA participated in the Speaker Program, the number of prescriptions she wrote fluctuated, in accordance with her payments from Insys.   For example:

        a.      In 2012, Insys paid RAJNINDER JUTLA approximately $7,200.  In that same year, RAJNINDER wrote approximately 24 prescriptions for Subsys.

        b.      In 2013, Insys paid RAJNINDER JUTLA approximately $26,500. In that same year, RAJNINDER JUTLA wrote approximately 129 prescriptions for Subsys.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1     c.     In 2014, Insys paid RAJNINDER JUTLA $35,400.  In that same

2  year, RAJNINDER JUTLA wrote approximately 210 prescriptions for Subsys.

3     d.     In 2015, Insys paid RAJNINDER JUTLA $32,400.  In that same

4  year, RAJNINDER JUTLA wrote approximately 158 prescriptions for Subsys.

5     e.     In 2016, Insys paid RAJNINDER JUTAL $8,300.  In that same year,

6  RAJNINDER JUTLA wrote approximately 22 prescriptions for Subsys.

7                    ***Sham Speaker Programs***

8     51.    Many of RAJNINDER JUTLA's Speaker Programs were sham programs,

9  examples of which are described below:

10     a.     Individuals who were friends and/or colleagues of

11  RAJNINDER JUTLA, attended multiple Speaker Programs, at some of which

12  RAJNINDER JUTLA made no presentation about Subsys.  Because all legitimate

13  Speaker Programs required the use of an identical, or nearly identical, pre-approved slide

14  presentation, there was no educational purpose for health care professionals to attend

15  Speaker Programs on a repeated basis.

16     b.     One individual, M.Z., a personal friend of RAJNINDER JUTLA's,

17  attended ten Speaker Programs between December 2012 and February of 2015, including

18  four at which M.Z. was the sole provider present other than RAJNINDER JUTLA.

19  RAJNINDER JUTLA was paid $7,600 for these four purported Speaker Programs.

20

21     c.     On or about August 30, 2013, RAJNINDER JUTLA, K.W., and

22  L.M. and S.S., personal friends of RAJNINDER JUTLA's, had dinner at a high-end

23  restaurant in Portland, Oregon to celebrate L.M.'s birthday.  L.M. was the only provider

24  attendee at the dinner other than RAJNINDER JUTLA.   Later, RAJNINDER JUTLA

25  forged the signature of L.M. on a Speaker Program sign-in sheet for the date and location

26  of the dinner, after L.M. declined to sign the sign-in sheet because it had been a birthday

27  dinner, not a Speaker Program.  RAJNINDER JUTLA was paid $800 for this purported

28  Speaker Program.

INDICTMENT - 11
RAJNINDER JUTLA

1            d.      On or about September 5, 2013, RAJNINDER JUTLA conducted a

2    purported Speaker Program at which there were no attendees, other than RAJNINDER

3    JUTLA, who were authorized under Washington State law to prescribe controlled

4    substances.  RAJNINDER JUTLA was paid $1600 for this purported Speaker Program.

5                 ***False and Fraudulent Medical Records and Opt-In Forms***

6        52.     RAJNINDER JUTLA and K.W. met frequently in order to discuss new

7    patients for whom RAJNINDER JUTLA could prescribe Subsys or patients already

8    receiving Subsys for whom she could increase the dosage.

9        53.     RAJNINDER JUTLA often prescribed Subsys for "off-label" uses,

10    meaning patients who were suffering from a wide variety of ailments and not necessarily

11    from breakthrough pain due to cancer.

12        54.     RAJNINDER JUTLA knew that the number of Speaker Programs, and

13    consequently, speaking fees, she received was dependent on the number of Subsys

14    prescriptions she wrote that were ultimately authorized and paid for by insurance

15    companies.

16        55.     In order to obtain Speaker Programs and the associated remuneration from

17    Insys, RAJNINDER JUTLA regularly provided and caused to be provided false and

18    fraudulent information to Plan Sponsors, PBM's and insurance companies to obtain

19    insurance coverage for Subsys prescriptions, including but not limited to false and

20    misleading information regarding (a) historical cancer diagnoses; (b) the ICD-9 diagnosis

21    code associated with the Subsys prescription; and, (c) the effectiveness of other

22    medications that had been tried and failed.  By providing and causing to be provided false

23    information to insurance companies, Plan Sponsors and PBM's, RAJNINDER JUTLA

24    caused and intended to cause those entities to issue prior authorizations and pay for her

25    patients' Subsys prescriptions, which, in turn, generated increased profits to Insys, and

26    increased remuneration, in the form of honoraria for Speaker Programs and free meals, to

27    RAJNINDER JUTLA.

28

INDICTMENT - 12
RAJNINDER JUTLA

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    56.    RAJNINDER JUTLA told patients that a prior cancer diagnoses would

2    justify insurance coverage of Subsys, notwithstanding the fact that the patients were not

3    suffering any pain due to the historical cancer, and it was not the purpose for which the

4    patients saw RAJNINDER JUTLA, nor the purpose for which RAJNINDER JUTLA

5    prescribed Subsys.

6    57.    The following sub-paragraphs are representative examples of false

7    statements and misrepresentations made by RAJNINDER JUTLA in patient medical

8    chart notes and Opt-in Forms for the purpose of obtaining prior authorization and

9    insurance coverage for Subsys prescriptions she wrote:

10    a.    Patient B.A. saw RAJNINDER JUTLA for treatment of her chronic

11    pain and fibromyalgia.  B.A. was not treated by RAJNINDER JUTLA for cancer or any

12    cancer-related condition.  On or about June 20, 2014, RAJNINDER JUTLA prescribed

13    Subsys to B.A.  On that same date, RAJNINDER JUTLA listed the ICD-9 code 338.3

14    (neoplasm related pain[2]) and cervical dysplasia in B.A.'s medical chart for the first time.

15    On July 17, 2014, RAJNINDER JUTLA completed an Opt-in Form listing the ICD-9

16    code 338.3 as one of the diagnosis codes in support of the prior authorization for Subsys.

17    b.    Patient D.L. saw RAJNINDER JUTLA for chronic pain in her neck,

18    as the result of an injury.  D.L has never had cancer and was not treated by RAJNINDER

19    JUTLA for cancer or any cancer-related condition.  On or about May 5, 2014,

20    RAJNINDER JUTLA prescribed Subsys to D.L.  On that same date, RAJNINDER

21    JUTLA listed ICD-9 code 338.3 and fibromas in D.L.'s medical chart for the first time.

22    On or about May 5, 2014, RAJNINDER JUTLA signed an Opt-in Form listing ICD-9

23    code 338.3 and "breast mass" in support of the prior authorization for Subsys.

24    c.    Patient J.W. saw RAJNINDER JUTLA for chronic pain related to

25

26

27    _____

[2] According to the National Cancer Institute, a neoplasm is an abnormal mass of tissue that results when cells divide

28    more than they should or do not die when they should.  Neoplasms may be benign (not cancer), or malignant
(cancer).  A neoplasm can also be called a tumor.

INDICTMENT - 13
RAJNINDER JUTLA

work accidents and fibromyalgia.  J.W. has never had cancer and was not treated by RAJNINDER JUTLA for cancer or any cancer-related condition.  On or about April 25, 2014, RAJNINDER JUTLA prescribed Subsys to J.W.  On that same date, RAJNINDER JUTLA listed ICD-9 code 338.3 and uterine fibroids in J.W.'s medical chart note for the first time.

58.     During the aforementioned timeframe for the conspiracy from approximately March 2012 through October 2016, RAJNINDER JUTLA wrote more than 540 prescriptions for Subsys, including more than 80 prescriptions for patients covered by Medicare.  Medicare paid more than $620,000 for these prescriptions.

D.     **Acts in Furtherance of the Conspiracy (Overt Acts)**

59.     In furtherance of the conspiracy and to accomplish its objectives and purposes, the following acts, among others, were committed by one or more of the co-conspirators in the Western District of Washington and elsewhere:

60.     On or about October 9, 2014, RAJNINDER JUTLA met with some individuals at the Capital Grille in Seattle, Washington, where she purportedly spoke about Subsys.  The only attendee at the dinner, other than Insys employees, was RAJNINDER JUTLA's friend M.Z.  The dinner was M.Z.'s ninth ISP presentation attended.

61.     On or about October 14, 2014, RAJNINDER JUTLA received check number 27111 issued by Plan 365 Inc., in the amount of $2,200, as payment for the October 9, 2014, ISP event.

62.     On or about February 10, 2015, RAJNINDER JUTLA met with some individuals at Capital Grille in Seattle, Washington, where she purportedly spoke about Subsys.  The only attendee at the dinner, other than Insys employees, was RAJNINDER JUTLA's friend M.Z.  The dinner was M.Z's tenth ISP presentation attended.

INDICTMENT - 14
RAJNINDER JUTLA

63.     On or about February 18, 2015, RAJNINDER JUTLA received check number 29358 issued by Plan 365, Inc., in the amount of $2,200, as payment for the February 10, 2015, ISP event.

64.     On or about May 8, 2015, RAJNINDER JUTLA signed and caused to be submitted to the IRC an Opt-in Form for patient K.W. that falsely listed ICD-9 code 338.3 (neoplasm related pain) as one of the diagnosis codes in support of the prior authorization, and falsely listed a history of cervical cancer as a rationale for the prior authorization.

65.     On or about June 26, 2015, JUTLA signed and caused to be submitted to the IRC an Opt-in Form for patient S.G. that falsely listed ICD-9 codes V10.51 (history of bladder cancer), and 338.3 (neoplasm related pain) as two of the diagnosis codes in support of the prior authorization, and falsely listed "pelvic pain residual from cancer" as a rationale for the prior authorization.

All in violation of 18 U.S.C. § 371.

## COUNTS 2-4
### (Receipt of Kickbacks)

66.     The Grand Jury realleges and incorporates by reference paragraphs 1- 65 above as if fully set forth herein.

67.     In exchange for prescribing Subsys to her patients and increasing the dosage of Subsys prescribed to her patients, including but not limited to those prescriptions reimbursed by Medicare, RAJNINDER JUTLA was paid compensation by Insys.

68.     Insys funneled money to RAJNINDER JUTLA by paying her for purported Speaker Programs RAJNINDER JUTLA provided, ostensibly to other health care professionals, concerning Subsys.  This money was paid to RAJNINDER JUTLA to reward her for prescribing Subsys to her patients, to incentivize her to continue to prescribe Subsys to new patients, and to increase the dosages of Subsys she prescribed to existing patients.

INDICTMENT - 15
RAJNINDER JUTLA

69.     On or about the dates listed below, at Seattle, in the Western District of Washington, and elsewhere, RAJNINDER JUTLA did knowingly and willfully solicit and receive the remuneration listed below, directly and indirectly, overtly and covertly, in cash and in kind, in return for purchasing and ordering, and arranging for and recommending the purchasing and ordering of goods, services, and items, that is Subsys prescriptions, for which payment was made in whole or in part by a Federal health care program, specifically, Medicare:

| Count | Date Payment Received by RAJNINDER JUTLA | Payment Amount | Date and Place of Purported Speaking Program |
|-------|------------------------------------------|----------------|----------------------------------------------|
| 2 | On or about August 20, 2014 | $2,200 | August 13, 2014 at the Capital Grille, Seattle, Washington. |
| 3 | On or about October 14, 2014 | $2,200 | October 9, 2014 at the Capital Grille, Seattle, Washington. |
| 4 | On or about February 18, 2015 | $2,200 | February 10, 2015 at the Capital Grille, Seattle Washington. |

All in violation of 42 U.S.C. § 1320a-7b(b)(1)(B).

## COUNTS 5-12
### (Health Care Fraud)

70.     The Grand Jury realleges and incorporates by reference paragraphs 1-69 above as if fully set forth herein.

**A.     The Scheme**

71.     Beginning in or about February 2012, and continuing until about October 2016, at Seattle, in the Western District of Washington, and elsewhere, the defendant, RAJNINDER JUTLA, knowingly and willfully executed and attempted to execute a scheme and artifice to defraud any health care benefit program, and to obtain money from any health care benefit program, by means of materially false and fraudulent pretenses,

INDICTMENT - 16
RAJNINDER JUTLA

1   representations, and promises, in connection with the delivery of and payment for health

2   care benefits, items and services.

3   **B.    Manner and Means**

4       72.    RAJNINDER JUTLA knew that the number of Speaker Programs, and

5   consequently, speaking fees, she received was dependent on the number of Subsys

6   prescriptions she wrote that were ultimately authorized and paid for by insurance

7   companies.

8       73.    It was part of the scheme that RAJNINDER JULTA prescribed Subsys to

9   numerous patients who did not currently have cancer or breakthrough cancer pain.

10      74.    It was a further part of the scheme that RAJNINDER JUTLA included

11  historical cancer diagnoses and ICD-9 codes corresponding to cancer-related diagnoses

12  and neoplasm-related pain in medical records for patients who did not currently have

13  cancer, cancer-related pain, or neoplasm-related pain, and who were not seeing

14  RAJNINDER JUTLA for treatment of cancer, cancer-related pain, or neoplasm-related

15  pain. RAJNINDER JUTLA included these items in the medical records of those patients

16  to whom she prescribed Subsys for the sole and express purpose of causing insurance

17  coverage and insurance payments for Subsys.

18      75.    Upon review of patients' medical records and based on instructions from

19  RAJNINDER JUTLA, RAJNINDER JUTLA's office staff, as well as Insys sales

20  representatives, including J.H. and K.W., included these historical cancer diagnoses and

21  ICD-9 codes, on Opt-in Forms, with the intent that the forms would be used by the IRC

22  as part of the prior authorization process for Subsys.

23      76.    It was a further part of the scheme that RAJNINDER JUTLA signed and

24  submitted or caused to be submitted Opt-in Forms for Subsys to the IRC with the

25  understanding that that information would be provided to Plan Sponsors, PBMs, and

26  insurance companies.  These Opt-in Forms falsely represented the diagnosis code

27  associated with the Subsys prescription was 338.3 (neoplasm related pain), or listed a

28  historical or non-existent cancer diagnosis as a rationale for the prior authorization.  In

INDICTMENT - 17
RAJNINDER JUTLA

1  truth and in fact, RAJNINDER JUTLA knew full well that these patients did not

2  currently have cancer and were not suffering from breakthrough cancer pain when she

3  submitted and caused to be submitted the Opt-in Forms to the IRC.  Some of these

4  patients never had any form of cancer.  Others had previously been diagnosed with

5  cancer but had recovered, were in complete remission, and were suffering from pain

6  unrelated to their prior cancer diagnosis.

7       77.     It was a further part of the scheme that RAJNINDER JUTLA submitted or

8  caused to be submitted fraudulent prior authorization requests for Subsys and Opt-in

9  Forms to the IRC falsely stating that other short-acting narcotics had been tried and

10  proven ineffective.

11       78.     It was a further part of the scheme that, based in part on RAJNINDER

12  JUTLA's false and fraudulent representations, the Plan Sponsors, PBMs and insurance

13  companies approved the payment for Subsys for numerous of RAJNINDER JUTLA's

14  patients who were not suffering from breakthrough cancer pain, causing hundreds of

15  thousands dollars in losses to Medicare, Plan Sponsors, PBM's and the insurance

16  companies.

17  **C.**    **Executions of the Scheme**

18       79.     On or about the dates set forth below, at Seattle, in the Western District of

19  Washington, and elsewhere, for the purpose of executing the aforementioned scheme and

20  artifice, and attempting to do so, the defendant, RAJNINDER JUTLA, did knowingly

21  submit, and cause to be submitted, to the below listed insurance companies and PBM's,

22  for the patients identified below, the false and fraudulent material set forth below:

23  /

24  /

25  /

26

27

28

INDICTMENT - 18
RAJNINDER JUTLA

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| Count | Date | Insurance Company/PBM | Patient | Chief Complaint (per Medical Chart) | False or Fraudulent Material |
|---|---|---|---|---|---|
| 5 | 9/13/14 | OptumRx | E.G. | Chronic shoulder pain. | Medical Chart Note listing ICD-9 code 338.3 (neoplasm-related pain) as diagnosis code associated with Subsys prescription, and listing medical history of skin cancer to obtain prior authorization for Subsys. |
| 6 | 10/20/14 | Express Scripts | A.R. | Chronic low back and neck pain. | Opt-in Form listing ICD-9 code 338.3 (neoplasm-related pain), and 189.0 (malignant neoplasm of the kidney) as applicable diagnosis codes to obtain prior authorization for Subsys. |
| 7 | 1/20/15 | Express Scripts | H.H. | Persistent neck, back and right hip pain. | Opt-in Form listing ICD-9 code 338.3 (neoplasm-related pain) as applicable diagnosis code, and history of breast fibroma, as a rationale for prior authorization for Subsys. |
| 8 | 4/30/15 | OptumRx | M.R. | Persistent neck, arm and low back pain. | Opt-in Form listing history of colon polyps as a rationale for prior authorization for Subsys. |
| 9 | 5/8/2015 | Optum Rx | K.W. | Foot pain, chronic shoulder pain, and back pain. | Opt-in Form listing ICD-9 code 338.3 (neoplasm-related pain) as applicable diagnosis code, and history of cervical cancer as a rationale for prior authorization for Subsys. |
| 10 | 6/26/15 | Express Scripts | S.G. | Chronic neck, back and lower extremity pain. | Opt-in Form listing ICD-9 code 338.3 (neoplasm-related pain), and V10.51 (history of malignant neoplasm of the bladder) as applicable diagnosis codes, and listing pelvic pain residual from cancer as a rationale for prior authorization for Subsys. |
| 11 | 6/29/15 | Cigna | J.B. | Chronic low back pain. | Opt-in Form listing ICD-9 code 338.3 (neoplasm-related pain), and V10.51 (history of malignant neoplasm of bladder) as |

INDICTMENT - 19
RAJNINDER JUTLA

| | | | | | applicable diagnosis codes for prior authorization for Subsys. |
|---|---|---|---|---|---|
| 12 | 8/14/15 | Moda Health Ins. | J.K. | Persistent neck, back, elbow, and hip pain. | Opt-in Form listing ICD-9 code 338.3 (neoplasm-related pain), and V10.82 (history of melanoma) as applicable diagnosis codes, and history of melanoma as a rationale for prior authorization for Subsys. |

All in violation of 18 U.S.C. §§ 1347 and 2.

### ASSET FORFEITURE ALLEGATIONS

The allegations in Count 1 are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C). Upon conviction of Conspiracy to Pay and Receive Kickbacks, as charged in Count 1, RAJNINDER JUTLA shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), any and all property, real or personal, that constitutes or derives from any proceeds she obtained as a result of the offense.

The allegations in Counts 2 through 4 are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(7). Upon conviction of one or more counts of Receipt of Kickbacks, as charged in Counts 2 through 4, RAJNINDER JUTLA shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all property, real or personal, that constitutes or derives from any proceeds she obtained as a result of the offense(s).

The allegations in Counts 5 through 12 are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(7). Upon conviction of one or more counts of Healthcare Fraud, as charged in Counts 5 through 12, RAJNINDER JUTLA shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all property, real or

INDICTMENT - 20
RAJNINDER JUTLA

1   personal, that constitutes or derives from any proceeds she obtained as a result of the

2   offense(s).

3         Substitute Assets. If any of the property described above, as a result of any act or

4   omission of the defendant:

5         a.     cannot be located upon the exercise of due diligence;

6         b.     has been transferred or sold to, or deposited with, a third party;

7         c.     has been placed beyond the jurisdiction of the Court;

8         d.     has been diminished in value; or,

9         e.     has been commingled with other property which cannot be divided without

10  difficulty,

11  /

12  /

13  /

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDICTMENT - 21
RAJNINDER JUTLA

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    it is the intent of the United States, pursuant to Title 21, United States Code, Section

2    853(p) and Title 28, United States Code, Section 2461(c), to seek the forfeiture of any

3    other property of the Defendant, up to the value of the above-described forfeitable

4    property.

5

6                                   A TRUE BILL:

                                    DATED: 7 - 24 - 2019

7

8                                     *Signature of the foreperson is redacted*

9                                     *pursuant to the policy of the Judicial*

10                                    *Conference of the United States*

11                                     FOREPERSON

12

13

14    BRIAN T. MORAN

15    United States Attorney

16

17

18    ANDREW C. FRIEDMAN

19    Assistant United States Attorney

20

21

22    MATTHEW D. DIGGS

23    Assistant United States Attorney

24

25

26

27

28

INDICTMENT - 22
RAJNINDER JUTLA

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970