# EXHIBIT B

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//FOUO

FEDERAL BUREAU OF INVESTIGATION

Date of entry   05/20/2019

On 5/9/2019, JULIE HUDSON (HUDSON), was interviewed by AUSA Matt Diggs and FBI SA Abel Peterson. Also present for the interview were HUDSON's attorneys, Carl Blackstone and Elizabeth Weinstein. After being advised of the identity of the interviewing agents and the nature of the interview, HUDSON provided the following information:

HUDSON first attended college in San Luis Obispo, then Washington State University, graduating in 1998.

After collage, HUDSON worked in the hospitality industry for several years. First, was a Ritz Carlton in California. In 1999, HUDSON moved to Atlanta, Georgia, where she was employed at another Ritz Carlton.

In 2001, HUDSON's first child was born. She started working at a day care facility during the early years of her first child.

In approximately 2005, HUDSON moved to the Seattle, Washington area where she began working at a hotel in Redmond, Washington.

From approximately 2009-2012, HUDSON worked at the Heathman hotel in Kirkland, Washington.

In 2012, HUDSON worked from home as a recruiter for the IT industry.

In approximately May, 2013, HUDSON began looking for a new job. She found an advertisement on-line posted by Insys Therapeutics (Insys). HUDSON applied for the job and first had a telephone interview with Insys Human Resources. HUDSON had a second interview that took place at a hotel, possibly the Hilton, near SeaTac Airport. The interviewers were KRISTIANA WRIGHT (WRIGHT) and RICHARD SIMON (SIMON). HUDSON was hired as an Area Business Liaison (ABL).

UNCLASSIFIED//FOUO

Investigation on  05/09/2019  at  Seattle, Washington, United States (In Person)

File #  209G-SE-2118090                                   Date drafted  05/13/2019

by  PETERSON ABEL J

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

ROI-FBI_00003947

UNCLASSIFIED//FOUO

209G-SE-2118090

Continuation of FD-302 of (U) Julie Hudson Second Interview , On 05/09/2019 , Page 2 of 10

In approximately May, 2014, HUDSON's title changed to ASSP, which was essentially a junior sales representative. Insys had just created this position at that time.

In approximately July, 2014, HUDSON's title again changed, this time it was to BRM, Business Relations Manager. At some point in 2016, HUDSON's title changed to Account Manager, and then back to BRM again in 2017. In July, 2018, HUDSON was laid off from Insys.

ABL DUTIES/TRAINING

One of the duties as ABL was to complete Insys Opt-In forms. These forms were completed when a new patient was started on Subsys. HUDSON's job was to make sure that these forms were filled out completely and sent to the Insys Reimbursement Center (IRC). HUDSON was also responsible for completing or guiding any other paperwork associated with the Prior Authorization (PA) or appeals process for Subsys approval.

When HUDSON started with Insys, she had a week of home study, followed by a week of training at Insys in Chandler, Arizona. MICHAEL BABICH, ALEC BURLAKOFF, and MICHAEL GURRY (GURRY) were all at the training. HUDSON was not sure if SIMON was at the training. HUDSON also attended yearly national sales meetings.

In 2016, HUDSON traveled again to Insys in Chandler, Arizona when her title changed to account manager.

The national sales meeting lasted approximately three days. HUDSON was sure that she received training materials at these meetings but stated that she no longer has those materials.

HUDSON remembered that she did receive compliance training on the relevant laws and regulations, but she did not remember the dates on which she received such training.

HUDSON's initial training did not match what she saw going on in the field. At training, HUDSON learned how to complete Opt-In forms, how to handle co-pays for patients, and was also trained on a flow chart for the PA process.

UNCLASSIFIED//FOUO

In the field, HUDSON learned how to write letters of medical necessity (LMN).

At HUDSON's initial training in Arizona, she learned what was needed on an Opt-In form before submitting the form back to the IRC. HUDSON was told that Subsys was for cancer pain. During the training, LIZ GURRIERI played an example of a typical telephone call between the IRC and an insurance company. On the call, the insurance company asked if the patient had break-through cancer pain. The IRC employee responded by saying that the "patient has breakthrough pain." GURRIERI explained that this type of response was how Insys was going to handle things.

HUDSON did not remember receiving any training on Insys Speaker Programs (ISP).

FIELD WORK

After her initial training, HUDSON went back to work in the field. WRIGHT was technically her equal as a co-worker at Insys, but HUDSON looked at WRIGHT as her boss. JESSICA KROLL was the District Sales Manager (DSM) above WRIGHT. After KROLL, there were several other DSMs, including in CRYSTAL SKELTON, then BETH MCKEY, followed by TIFFANY CROMARTIE.

In the field, HUDSON took part in weekly conference calls with GURRY. HUDSON was not sure if WRIGHT also took part in these calls. The purpose of the calls was to go over what was in the funnel for new patients. Patient's discussed were usually new patients that had started on Subsys and their Opt-In forms had already been sent to the IRC. The discussions centered on what step in the PA or appeals process the patient was in and what needed to be done to move the process along toward approval. HUDSON did not recall if Subsys approval strategies were discussed on the calls. GURRY ran the calls.

The doctors that HUDSON worked with were RAJNINDER JUTLA (JUTLA), PHILIP MATTHEWS, Dr. VOGELGASANG, as well as several doctors from Washington Center for Pain Management (WCPM). The WCPM doctors that HUDSON worked with were Dr. HONG, Dr. MAMBALAM, PETER PANG, and a physicians assistant named REED.

The amount of time that JUTLA spent with each doctor depended on the amount of paperwork in that office. HUDSON estimated that she spent the

majority of her time in the offices of JUTLA and WCPM.

The highest volume provider that HUDSON worked with was JUTLA.

Initially, HUDSON did not have a sense for which providers were speakers at ISPs. HUDSON did learn later that JUTLA was a paid speaker for Insys. Other speakers included Dr. HATHAWAY in Spokane, Washington and Dr. MALLORY in Idaho. HUDSON only met Dr. MALLORY on one occasion.

HUDSON did not have a sense as to when she learned that JUTLA was a paid speaker for Insys. HUDSON believed that WRIGHT told her that JUTLA was a speaker. HUDSON does not know how much JUTLA was paid for being a speaker. HUDSON never heard of a correlation between speaking events and scripts of Subsys. At the time, HUDSON never thought about any connection between JUTLA writing the most scripts of Subsys and also being the doctor that was a paid speaker for Insys.

HUDSON did not have a good relationship with JUTLA. JUTLA did not want HUDSON in her clinic when JUTLA was there. HUDSON had to work around JUTLA's schedule. HUDSON worked in JUTLA's Greenlake clinic on Fridays or whenever JUTLA was in Portland. UNIQUE LEE (LEE) or SRINYA SUKRACHAN (SRINYA) opened the clinic in the morning. HUDSON believed that SRINYA was a PA specialist for JUTLA. LEE had many "hats" at JUTLA's clinic, including walking the dogs.

JUTLA's patient population consisted mainly of chronic pain patients. Most of them suffered from back pain. As far as HUDSON could tell, not many of JUTLA's patients suffered from pain caused by cancer. HUDSON estimated that, over time, JUTLA had less than ten patients that suffered from cancer or had a history of cancer.

HUDSON was not in the exam room when JUTLA was seeing patients. On one occasion, HUDSON was at JUTLA's clinic when JUTLA was meeting with a patient. HUDSON was not in the exam room, but immediately after JUTLA finished with the patient, she sent the patient out to meet with HUDSON and WRIGHT.

HUDSON had an uncomfortable relationship with JUTLA. At one point, HUDSON used her own mother's ~~cancer~~ diagnosis as a a topic to help spark a

UNCLASSIFIED//FOUO

209G-SE-2118090

Continuation of FD-302 of (U) Julie Hudson Second Interview , On 05/09/2019 , Page 5 of 10

conversation with JUTLA. WRIGHT, on the other hand, spent a lot of time with JUTLA.

HUDSON did not hear JUTLA have discussions with patients about a history of cancer being a way to gain approval for medications, such as Subsys.

Opt-In forms were also filled out by WRIGHT. WRIGHT was at all of JUTLA's Saturday clinics. WRIGHT gave HUDSON on-the-job training on how to fill out Opt-In forms.

HUDSON remembered an occasion when WRIGHT asked HUDSON why she did not put a certain diagnosis code onto an Opt-In form. HUDSON did not remember which code WRIGHT had been concerned about at that time.

OPT-IN FORMS

(AGENT NOTE: HUDSON was shown an Opt-In form for ~~HAMILTON HALEY~~ (~~HALEY~~).)

HUDSON's title was BRM during two separate time periods while at Insys. Generally, the section titled "Practitioner Information" on the Opt-In forms was already filled out with JUTLA's info. On ~~HALEY's~~ Opt-In, the writing in that section was HUDSON's hand writing. SRINYA's name was listed on the form because she was the PA specialist.

The patient information on the form came directly from the patient chart. The medical information on the form came from the patient chart note or from the script. The diagnosis codes on the Opt-In form came from the Medication Section of the chart notes or were referenced in the Subjective Section of the chart notes. HUDSON may have had to look up the actual code base on a symptom or condition listed in the chart note. HUDSON would have just "Googled" it at times, but would have confirmed with JUTLA to make sure it was the correct code.

HUDSON stated that it is hard to remember what she knew at the time and what she has learned since from the criminal case involving Insys. She did remember that there was a conversation about the diagnosis code, 338.3, at one of the national sales meetings. 338.3 was often used on Opt-In forms because it was mentioned in the sales meeting. HUDSON definitely remembered a conversation with WRIGHT about the importance of using 338.3 on Opt-In forms. HUDSON stated that 338.3 was likely the code that WRIGHT had been

UNCLASSIFIED//FOUO

questioning HUDSON about, as mentioned earlier.

Diagnosis codes were sometimes provided to HUDSON via a sticky-note. There was a folder of pre-filled out Opt-Ins in JUTLA's back office. Sometimes WRIGHT would leave a sticky note on the folder with a diagnosis code or a diagnosis name, such as "History of some kind of cancer." The information from the sticky-note was to be put onto the Opt-In. HUDSON estimated that she received these sticky-notes with diagnosis information on them less than 10 times. In the cases where a code was not listed but rather a "history of some kind of cancer," HUDSON would look up that history online and show her phone to JUTLA for confirmation that HUDSON had located the correct code. JUTLA would review and approve very quickly. HUDSON then used the information to complete the Opt-In form. Once completed, she brought the completed Opt-In forms back to JUTLA for her signature.

If a sticky-note was provided with the diagnosis information, then HUDSON did not verify the information with the patient's chart note. At the time, HUDSON did not think much of the fact that the information on the sticky-note usually was related to some type of cancer.

HUDSON does not have any text messages between her and WRIGHT because her telephone crashed.

(AGENT NOTE: HUDSON was shown an Opt-In for ANGELA RESTAD (RESTAD).)

HUDSON would have looked up the cancer code, 189.0, and confirmed that it was the correct code to use with JUTLA.

HUDSON remembered that she was told to put even historical cancer diagnosis codes into the diagnosis section of the Opt-In. She did not remember who told her this but stated that it may have been information provided during a training call.

If a "V" is listed next to a diagnosis code, it means that the code relates to a prior history of that condition.

Any time that HUDSON had to look up a diagnosis code, she had to discuss the code with JUTLA at the time of obtaining JUTLA's signature for the Opt-In.

HUDSON remembered having conversations with WRIGHT during which WRIGHT told HUDSON that JUTLA had just learned that a particular patient had a prior history of cancer.

HUDSON stated that she now knows that you can still have pain related to a cancer even after the cancer diagnosis is no longer an issue.

The code 338.3 is connected to a diagnosis of a history of cancer. This made 338.3 relevant to obtaining an approval for Subsys. Other diagnosis codes for cancer were also relevant for obtaining an approval.

HUDSON's salary and bonus structure changed over time. At times it was based on all sections of an Opt-In being complete. Her bonus may have also been partly based on how many Opt-Ins were completed.

Some of the check boxes under the Rationale for Prior Authorization section on the Opt-In forms were filled out for all patients. The "Generic not reliable for patient" and "Provider-preferred product" were checked for all patients. The check box related to toleration of formulary medications was checked if it was relevant for that patient's insurance company.

The fee sheets for each date of service were filled out by JUTLA. The codes were also ranked by JUTLA. The fee sheets were another location from which HUDSON found relevant diagnosis codes for using on the Opt-In form.

Patient's often signed an Opt-In form at a later date, not at the time of the initial script of Subsys.

The newest version of Opt-In forms were filled out on a portal. Signatures were electronic. Physicians had a log-in with which they could access the portal from their computers. In most cases, HUDSON brought the Opt-In up on her iPad for JUTLA to sign.

It was a small portion of the total volume of Subsys scripts written by JUTLA that went to Linden Care Pharmacy to be filled. Specialty pharmacies stocked Subsys when many general pharmacies would not. Insys employees, including HUDSON, were instructed during a conference call to use specialty pharmacies when possible. Other specialty pharmacies included Avella, Dunmeadow, and Reset.

A big part of HUDSON's job was to pull-through on getting prescriptions filled at retail pharmacies. HUDSON also made sure that patients had a co-pay savings card. HUDSON often had to call pharmacies to inform them that a particular patient had been approved for Subsys. HUDSON received emails regarding approvals or denials of Subsys. The emails came from the IRC.

(AGENT NOTE: HUDSON was shown an Letter of Medical Necessity (LMN) for VALERIE MASTRULLO FREY (VMF).)

HUDSON was not sure if she completed this LMN. There was a template to follow when completing LMNs. HUDSON wrote LMNs for JUTLA to sign but she never put information into an LMN that she did not first find in the patient's chart notes. JUTLA signed the LMNs very quickly. JUTLA never changed anything or edited the LMNs. WRIGHT also wrote LMNs for JUTLA to sign. HUDSON often wondered why she was filling out LMNs for JUTLA to sign, instead of someone more qualified.

When HUDSON sent Opt-In forms to the IRC, she sometimes sent copies of chart notes along as well. The protocols may have changed over time as to whether or not chart notes were required to be sent along with an Opt-In to the IRC.

When sending in an appeal to a denial of Subsys, 3-6 months of chart notes were always included.

HUDSON remembered reaching out to a colleague, JUDY HENDERSON (HENDERSON), who worked with Dr. KESTEN in Colorado. HUDSON asked if HENDERSON was receiving all of the diagnosis information for Opt-In forms from the patient's medical chart. The reason that HUDSON was asking was that she had been receiving diagnosis information for the Opt-In forms via a sticky-note from WRIGHT. HUDSON estimated that she had received diagnosis information via sticky-note less than 10 times. The conversation was very brief and occurred while HUDSON was walking through the parking lot at JUTLA's clinic.

During the early stages of her time at Insys, HUDSON helped recruit attendees for ISP events. The process usually involved HUDSON dropping off physical copies of invites at doctor's offices. HUDSON did not keep track of who RSVP'd for events and was not involved enough to know who did.

WRIGHT was involved with the ISPs. At one point, WRIGHT had told HUDSON that it was difficult to get doctors to attend the ISPs. HUDSON remembered that JUTLA made recommendations about who should be invited to the ISP events and who to give invite fliers to.

HUDSON was not aware of doctors friends attending multiple ISP dinners. HUDSON was familiar with the name of MICHELLE ZHONG. HUDSON did not recall any conversation with WRIGHT about certain attendees going to multiple ISP events.

When the criminal complaint against Insys became public, HUDSON and her colleague, HENDERSON, reviewed it together. It was shocking.

After becoming aware of the criminal allegations against Insys, HUDSON remained employed by Insys. Her mother had been diagnosed with cancer in 2014, so HUDSON had become more comfortable being around cancer treatment. The job also gave HUDSON a lot of flexibility. In 2016, HUDSON met with the Insys Corporate office for some compliance training that that Insys was putting on after the criminal complaint became public. This training gave HUDSON some reassurance to stay at Insys.

(AGENT NOTE: HUDSON was shown a sign-in sheet for an ISP event that occurred on 10/2/2013.)

The signature next to HUDSON's name is HUDSON's signature. The other writing associated with HUDSON's name is WRIGHT's. HUDSON did not recall ever submitting paperwork for an ISP. Submitting the ISP paperwork was the job of the sales rep. WRIGHT told HUDSON that she had signed HUDSON's signature at a program that HUDSON had not attended. The event was a dinner soon after HUDSON had been hired by Insys in 2013 or 2014. HUDSON did not remember the details of her conversation with WRIGHT regarding that incident. HUDSON did not think anything of it at the time. HUDSON did not recall WRIGHT ever saying that she forged other signatures.

HUDSON was not aware of the type of relationship that JUTLA had with Insys' Corporate office. At one point, SIMON or BURLAKOFF traveled to Seattle, but HUDSON was not sure if they met with JUTLA or not.

JUTLA drives a Porsche. HUDSON has never been to JUTLA's house.

UNCLASSIFIED//FOUO

209G-SE-2118090

Continuation of FD-302 of (U) Julie Hudson Second Interview , On 05/09/2019 , Page 10 of 10

WRIGHT tried to figure out ways to get HUDSON into JUTLA's office.

There may have been times that a patient signed an Opt-In form at the time of their first Subsys script, before all of the other information on the form was filled out. At other times, HUDSON remembered faxing Opt-In forms to the IRC that did not yet have a patient signature. In those cases, HUDSON later obtained the patient's signature on the form and faxed that in as well to the IRC.

HUDSON usually had JUTLA sign several Opt-In forms at once, in an attempt to be more efficient.

UNCLASSIFIED//FOUO

ROI-FBI_00003956